# Hess *v.* Rudder.

### *Statutory Action of Ejectment.*

1. *Boundaries; removal of fences.*—Where one of two adjacent land owners extends his fence so as to embrace within his enclosure lands belonging to the other, but in ignorance of the true boundary line between them, and with no intention of claiming such extended area, such possession of the lands so enclosed is not adverse or hostile to the true owner; but if the fence so extended is believed to be the true boundary line, and he claims ownership to the fence, even though the established division is erroneous, such possession will be adverse and hostile to the owner.

2. *Adverse possession; boundaries of land; claim of ownership.* Where one of two adjacent land owners, after the dividing line between the property has been surveyed, and a fence has been built thereon, goes into possession of the land up to such line, but with no intention of claiming property belonging to the other adjacent land owner, such possession of the land is not adverse or hostile to the true owner; but if the line so run and upon which the fence is built is believed to be the true boundary line between the adjacent lands, and such adjacent proprietor claims ownership to the fence, such possession will be adverse and hostile to the other owner, even though the established line is not the true boundary line; and if such possession is also actual, open, notorious, exclusive and continuous for a period of more than ten years, the holder thereof acquires a perfect title.

3. *Same; same; same.*—Where, after a dividing line between two adjacent tracts of land has been surveyed, each tract is sold to different parties, and each purchaser goes into possession believing the

[Hess v. Rudder.]

line so surveyed to be the true boundary line between the respective tracts, and he claims ownership to such line, such possession of each tract will be adverse and hostile up to such line, even though the division as established by the survey is erroneous.

4. *Ejectment*; *admissibility in evidence of plat made by surveyor.* Where, in an action of ejectment, the county surveyor testifies that he had surveyed the land sued for, and presents a plat of said land, which he testified was made by himself when making a survey of the lands, and that it was correct, said plat or map is admissible in evidence, even though the opposite party had no notice that such survey was being made ; said plat, under such circumstances, not being dependent for its competency as evidence upon the provisions of section 939 of the Code of 1886 (Code of 1896, § 3895); but the effect of such plat as evidence should be limited to the purposes for which it alone was admissible.

Appeal from the Circuit Court of Jackson.

Tried before the Hon. William L. Stephens, Special Judge.

This was a statutory action of ejectment, brought by the appellee, Sophronia E. Rudder, against the appellant, James A. Hess, to recover a 50 acre tract of land. The facts of the case are set forth at length in the opinion.

Upon the introduction of all the evidence, the court, at the request of the plaintiff, gave several written charges to the jury. The defendant separately excepted to the giving of each of these charges, and also separately excepted to the refusal by the court to give, among other charges requested by him, the following : "If the jury believe the evidence, they will find the issue in favor of the defendant."

There were verdict and judgment for the plaintiff. The defendant appeals, and assigns as error the giving of the charge requested by the plaintiff, and the refusal to give the several charges requested by the defendant.

Martin, Bouldin & Ashley, for appellant.—1. The line was established by survey before either plaintiff or defendant purchased, and each purchased with reference to the line so surveyed. The line was the limit of each tract, and neither obtained title beyond such line. *Crampton v. Prince*, 83 Ala. 246.

2. If the line was not settled at the time of their purchases, then the agreement to set up the corners

thereon, the setting up of the corners, and holding possession on both sides, constituted it an agreed line. An agreed boundary line may be established by such parol agreement; it is not within the statute of frauds; it is binding without regard to the statute of limitations. 2 Devlin on Deeds, 1036; *Watrous v. Morrison*, 33 Fla. 261; 39 Amer. St. Rep. 139; *Krider v. Miller*, 99 Mo. 145; *Lecomte v. Toudouze*, 82 Tex. 208; note to *Johnston v. Archibald*, 22 Amer. St. Rep. 35; *Vetzer v. Thoman*, 91 Am. Dec. 122; *Russell v. Maloney*, 94 Am. Dec. 358; 1 Devlin on Deeds, 158; and many authorities cited in these references.

3. Defendant's title was perfect by adverse possession. The facts being undisputed, adverse possession is a question of law. Defendant was entitled to the affirmative charge.—*Brown v. Cockerell*, 33 Ala. 38; *Alexander v. Wheeler*, 69 Ala. 332; *Humes v. Bernstein*, 72 Ala. 546; *Davis v. Caldwell*, 107 Ala. 526; 1 Am. & Eng. Encyc. of Law, p. 248.

TALLY & PROCTOR, *contra.*—The court properly refused to give the general affirmative charge for the defendant. The question of the defendant's adverse possession was one for the jury.—*Davis v. Caldwell*, 107 Ala. 526; *Brown v. Cockerell*, 33 Ala. 38; *Humes v. Bernstein*, 72 Ala. 546; *Alexander v. Wheeler*, 69 Ala. 332; *Hoffman v. White*, 90 Ala. 354.

BRICKELL, C. J.—This was an action of ejectment instituted by appellee in February, 1897, to recover a fifty acre tract of land in Jackson county, and arose out of a dispute between the owners of coterminous estates as to the division line between them. The defendant disclaimed possession of all that part of the land sued for lying west of a designated line, and pleaded not guilty as to the land lying east of said line. The land in controversy, as thus limited by the pleadings, consists of a narrow strip containing four or five acres, and the chief defense relied on was the adverse possession of said strip by defendant for the statutory period. The real point of contention in this court is whether the possession of the defendant up to the line west of which he disclaimed possession, was adverse in its character; the evidence in the record, even that of the plaintiff,

showing beyond question that it had all those other elements which, when coupled with a hostile claim of right, vest a perfect title in the holder—being actual, open, notorious, exclusive and continuous for a period of more than ten years.

We have frequently had occasion to consider the question as to when the possession of a continuous land owner becomes adverse to his neighbor, and to determine the rule applicable to the facts of particular cases. Possession to be adverse must be held under a claim of right, and there can be no adverse possession without an intention to claim title. Hence it is essential to the proper determination of the character of the possession to consider the intention with which it was taken and held. If one *occupies* land up to a certain fence because he believes that to be the line of his land, but not having any intention to *claim* up to the fence, if it should be beyond the line, the intent to claim title does not exist coincident with the possession, and the possession up to the fence is not, therefore, adverse. Where, however, the coterminous owners agree upon a line as the dividing line and occupy up to it, or when one of them builds a fence as the dividing line and occupies and claims to it as such, with knowledge of such claim by the other, the claim is presumptively hostile and the possession adverse.—*Brown v. Cockerell*, 33 Ala. 38; *Alexander v. Wheeler*, 69 Ala. 340; *Hoffman v. White*, 90 Ala. 354; *Davis v. Caldwell*, 107 Ala. 526. Although adverse possession is a fact, the burden of proving which rests on him who asserts it, yet the circumstances under which the possession was taken and held not infrequently give rise to a *prima facie* presumption of its adverse character, and dispense with any further proof in this respect, in the absence of any rebutting evidence to the contrary. An agreement between coterminous owners establishing the line, or the building of a fence by one of them under the circumstances above stated, accompanied by occupancy up to the line or fence, gives rise to such presumption, because possession taken under such circumstances is inconsistent with the idea that it is held otherwise than under a claim of right. But these are not the only facts that create this presumption even where the dispute is between coterminous owners. Any practical location by them of the division line, although there may be no ex-

[Hess v. Rudder.]

press agreement, followed by occupancy up to the line located, may, under particular circumstances, have the same effect. If one buy a house pointed out to him, pay for it and immediately go into possession under his deed, believing it to be the one described therein, such possession would be presumptively adverse, although the deed described a different house, and the law will so pronounce it if there be no rebutting testimony. So, if one while negotiating for a tract of land, and before the purchase thereof, have pointed out to him by the owner one of the boundaries separating it from the adjoining tract, and after purchasing it be put into possession and occupy up to the boundary line thus pointed out, believing it to be the true line, such occupancy would be presumed to be under a claim of right; the circumstances under which it was taken, in the absence of rebutting testimony, leaving no room for mere inference not based on facts in evidence, that it was otherwise. We are of the opinion, after a careful consideration of the evidence in this case, that it shows without conflict that the possession of Hess, the appellant, was adverse during the whole period from 1883 up to the commencement of this action, and since it was not lacking in any of the other essential elements, the defendant was entitled to the general charge in his favor. In the fall of 1882 appellee's husband, Rudder, was negotiating with one H. J. Cheney, for the purchase of the fifty acre tract of land described in the complaint. At the same time appellant was negotiating with Cheney for the purchase of the adjoining tract. After Rudder had closed the trade, but before Hess had done so, and before deeds had been made to either, Cheney had the county surveyor run the lines of the fifty acre tract including the boundary line in dispute. Both Rudder and Hess were present when these lines were run and the division line established, and assisted in running them. When the last corner, on the south bank of the river at one end of the disputed boundary, was established, the surveyor directed Rudder to drive a stake there, which he did, and after some figuring said he had made an error and would not complete the work that evening. The next morning he went to the line with Rudder's son and hacked the trees through the wooded part of the line. Whether he surveyed a new line, and if so, whether it differed from the line

34

run the day before, is not positively shown by the evidence, but Rudder testifies, "I learned that he went down the next morning and marked the line by hacks on the trees." The inference is that no new line was run and that the trees hacked were on the line run the day before in the presence of Hess and Rudder. After the survey deeds were made to Rudder's wife and Hess, that to the former being dated November 1, 1882, and that to the latter, December 25, 1882, and each went into possession of the land purchased by him. In the following spring, 1883, Rudder suggested to Hess that they erect stones at the corners of the division line, and a day was agreed upon between them to meet and do so. On the day named, Hess failing to appear, Rudder set the stones. At the south end of the line, at the foot of the mountain, there was no stake marking the corner, but he placed the stone at what he believed to be the corner, and he testifies that he "saw marked trees in line with the corner so set up." At the north end, on the river bank, he found lying on the ground the stake he had driven at the direction of the surveyor, and he set up the stone at that point, believing it to be the corner established by the surveyor. In 1883 he made a turning row from the stone on the river bank across the cleared land on a line with the stone at the foot of the mountain. In the spring of 1885 Rudder asked Hess to help build a fence on the line, and the latter told him to build a fence through the cleared land next to the river, and he would build a temporary brush fence through the wooded part until the briars and thickets were cleared off, and then he would build a fence on the line. Rudder built the fence on the turning row previously made by him, and the same has remained unchanged since then, and afterwards Hess built a wire fence along the rest of the line, fastening it to the marked trees. In 1886, and at other times, these wires became detached on account of drifts from the river piling against them during freshets, and were temporarily fastened to other trees, sometimes off the line, but finally the wires were attached to stakes driven on the line from the stone on the river bank to that at the foot of the mountain set up by Rudder. Both parties always regarded this as the true line from the time it was first established as above stated, and each occupied and cultivated up to it until the institution of this suit.

There seems to have been no express agreement as to the true line other than such as may be inferred from the circumstances above set forth, but neither party ever doubted it was the true line until a survey was made just before the commencement of this action. These facts are undisputed and are taken chiefly from appellee's evidence as it appears in the record. Although there was no express agreement fixing the dividing line, they have equal efficacy, and are entitled to equal, if not greater, weight in determining the character of the possession of each. They show that each negotiated for land *bounded by this line,* and not for land bounded by an unknown line described in a deed, that they *bought* up to this line, paid for land extending to this line, occupied and cultivated up to it, believing it to be the line described in the deeds, built a common fence on it, and never questioned its being the true line for a period of fourteen years. From them follows the presumption, which must prevail in the absence of rebutting testimony, that each intended to *claim* title up to this line regardless of the line described in the deeds, and that the possession of each was under claim of title and therefore adverse. There is no room under these facts, unrebutted, for an inference that they did not intend to claim up to this line if it should prove to be beyond the true line. Whatever may have been the description in the deeds, this was in fact *the true line,* since it was land bounded by this line that they bought, and if any other line was described in the deed, it was an erroneous description, capable of reformation in a court of equity under the facts shown in this case. The defendant testified that "he did not intend to claim Mrs. Rudder's land," but further said, "he did not mean by saying he did not intend to claim Mrs. Rudder's land, that he did not claim to the line from rock to rock; the line was run and marked and located before he bought the land, and he bought to that line and claimed it as his own regardless of anybody. He knew it was the line when he bought the land, and he claimed his own land, not Mrs. Rudder's." This testimony does not, as contended by counsel, show an intention to claim up to the line only in the event it should be the true line, and does not rebut the presumption arising from the facts stated; but, on the contrary, indicates an intention to claim to

the line from rock to rock regardless of the line described in the deed.   It tends to strengthen, rather than to weaken, the presumption.   The court erred in refusing to give the general charge in favor of the defendant at his request.

Moreover, the deed under which plaintiff claimed title to the strip in controversy, together with the evidence offered in connection with it, fails to show that said strip is embraced in the description therein.   The second and third calls of the deed are from a point on a public road, "thence along the same so as to make a distance of 67 poles and 8 links on a bearing of north 41 degrees east; thence north 49 degrees west 132 poles to the bank of the Tennessee river."   Just prior to the commencement of this suit plaintiff had the land surveyed by the county surveyor, after notice given to the defendant, who, as a witness for plaintiff, testified that instead of running the line along the public road, or on a bearing of north 41 degrees east, as the deed called for, he ran it north 54 degrees east, for the required distance, a variation of 13 degrees from the course mentioned in the deed, but how far from the road does not appear; and that he did this in order to reach a point just 132 poles from the top of the river bank.   In construing descriptions of boundaries to land it is a general rule that natural or artificial monuments shall control courses and distances.—*Crampton v. Prince*, 83 Ala. 246.   One of the boundaries of the land conveyed by this deed must, therefore, be regarded as the public road mentioned therein, along which the line must run for a distance of 67 poles and 8 links, and from the termination of this line a line running north 49 degrees west to the bank of the Tennessee river, that is, to the ordinary stage of the water, must constitute another boundary, whether the distance to this point be 132 poles, or more or less.   The survey made by the county surveyor, departing as it did 13 degrees from the course named in the deed, would embrace the strip in controversy according to the evidence; and if the public road were straight and bore north 41 degrees east, the description in the deed would necessarily embrace the strip, since a line run north 41 degrees east a given distance would terminate further north and therefore further in the direction of the Hess land than one run the same distance north 54 degrees

east. But the evidence shows that the road is not straight, but makes various curves, and no-evidence was offered to show where a line 67 poles and 8 links in length following the road would terminate, whether east or west of the line up to which the parties have always occupied. There is, therefore, a want of evidence showing title in plaintiff to any land east of the line upon which the parties built their fence, which is the line designated in the defendant's pleas.

It is unnecessary, in view of what has been said, to discuss the numerous charges given at the request of the plaintiff, since they relate either to the question of the adverse character of the defendant's possession, or to the question of plaintiff's title under her deed to the strip in controversy.

The plat or survey made by the county surveyor, Wood, if offered as an official survey under section 939 of Code of 1886, (Code of 1896, § 3895), was inadmissible because it was not a plat or survey of the land described in the deed or in the complaint, and was not presumptive evidence against the defendant. It does not, however, appear that it was offered under the provisions of said section as an official plat, and if not, it was competent in connection with the surveyor's testimony, but its effect as evidence, should have been limited to the purpose for which it alone was admissible. *Vandiver v. Vandiver*, 115 Ala. 328; *Bridges v. McClendon*, 56 Ala. 327.

The judgment of the circuit court is reversed and the cause remanded.